IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CLASSROOMDIRECT.COM, LLC,      }
                               }
        Plaintiff,             }
                               }        CIVIL ACTION NO.
v.                             }        06-AR-1669-S
                               }
DRAPHIX, LLC,                  }
                               }
        Defendant.             }


**MEMORANDUM OPINION**

Before the court is the motion of plaintiff, Classroomdirect.com, LLC ("Classroom"), for partial summary judgment on two of its claims against defendant, Draphix, LLC ("Draphix"). Classroom argues that it is entitled to judgment as a matter of law on its breach of contract and trademark infringement claims for two reasons. First, Classroom argues that the final judgment entered against Draphix in a related lawsuit in state court has preclusive effect in this action and compels a judgment against Draphix. Second, and alternatively, Classroom argues that it is entitled to summary judgment on the merits of the case. Draphix contests both these arguments and contends, to the contrary, that because Classroom could have brought the claims in the present action in the earlier state court action, the doctrine of *res judicata* operates as a bar to Classroom's suit. Classroom has not requested summary judgment on its third claim for fraudulently procuring a trademark registration.

-1-

After a review of the facts and arguments presented in this case and in the earlier state court action, the court concludes that Classroom is entitled to the partial summary judgment it seeks.

## I. Facts[1]

This case is the latest manifestation of a virtually interminable dispute. It is the third case involving the parties and the second before this court. The other related suit was litigated to a judgment in the Circuit Court of Jefferson County (the "state court action"). Appeals taken from the state court action are presently pending. Given the pending appeals and the resolution of the present motion, the future arc of these proceedings is difficult to discern.

Classroom is engaged in the sale of educational and classroom supplies through its website and catalogue. Classroom is the holder of the federally registered service mark "RE-PRINT" (or "the Mark"). According to Classroom, the market for educational supplies has long associated the RE-PRINT mark with Classroom's sales activities. Although it stopped using the Mark in 1998, Classroom claims that its customers still use the RE-PRINT name when placing orders and associate the RE-PRINT mark with Classroom.

Before 2001, Classroom was also engaged in the sale of

---

[1] The recitation of facts in this opinion is adopted, in part, from this court's earlier opinion in the case. See Document #9, CV-06-AR-1669-S, 1-3.

engineering, architectural, and drafting supplies to professionals in these industries.  In 2001, Classroom spun off its engineering, architectural, and drafting supplies division into a new entity, which organized as Re-Print/Draphix, LLC, the entity now referred to as Draphix.[2]  As part of the formation of the new entity, Draphix and Classroom entered into two related contractual agreements.  The first, the Agreement for Purchase and Sale of Assets (the "APA"), encompassed the sale of certain of Classroom's assets to Draphix including inventory, business records, fixed assets related to the business, and the rights to the trademark "Draphix."  The agreement explicitly exempted from sale all assets not expressly included in the contract. APA, Def's Ex. 5, ¶2.  The APA did not expressly include the RE-PRINT mark in the items sold to Draphix.  The second agreement, the Service Mark Licensing Agreement (the "SMA"), granted to Draphix a revocable license to the RE-PRINT mark, subject to certain limitations.  The SMA was both included as an exhibit and incorporated by reference into the APA.

The obvious purpose of the SMA was to permit the new entity, Draphix, to use the RE-PRINT mark in the context of the engineering and technical supplies business even as Classroom retained the right to the Mark in the school supply business.  Under the terms of the SMA, Draphix was prohibited from using the Mark "in

---

[2] *See* Document #27, Notice of Name Change.

connection with any sales, even of engineering, architectural, or drafting supplies, in the pre-K through 12 educational or school field." SMA, Pl.'s Ex. A, ¶1(e). The SMA also granted Classroom the right to terminate the agreement if Draphix breached its terms. Upon receiving notice of termination, the SMA entitles Draphix to 20 days within which to cure the identified breach. *Id.* at ¶10. If, after 20 days, the breach is not cured, the termination becomes effective.

The dispute between Classroom and Draphix began when Draphix, doing business as "Teacher Direct," expanded its sales operations and entered the educational supply market. With its expansion, Teacher Direct emerged as a direct competitor to Classroom. It was Draphix's sales activities in this context that prompted the first suit between the parties (the "first federal action"). Classroomdirect.com LLC v. Re-Print/Draphix LLC, CV-05-AR-0853-S. That action was ostensibly resolved when the parties entered into a Settlement Agreement". Unhappily for this court, the Settlement Agreement did not bring an end to the dispute. Shortly after the Settlement Agreement was reached, Classroom and Draphix accused each other of its breach. Following this court's determination that it lacked jurisdiction over Classroom's motion to enforce performance of the Settlement Agreement, Classroom brought suit in the state court, alleging both breach of contract and unfair competition. The state court action ended with an entry of

judgment on a jury's verdict for Classroom.  The jury answered a special interrogatory confirming that it found in Classroom's favor on the unfair competition claim.  The state court also entered a permanent injunction prohibiting Draphix from using the Re-Print mark in the school-supply context.  State Court Order, Pl.'s Ex. H, ¶I(e).  The parties have both appealed to the Supreme Court of Alabama but neither party argues that the pendency of that appeal, or its outcome, should affect the outcome in this court.

The present, or third, suit stems from what Classroom characterizes as a material breach of the SMA.  According to Classroom, during the course of discovery in the state court action, it learned that Draphix had engaged in the unauthorized use of the RE-PRINT mark in the sales activities related to the educational supplies market.  Classroom alleges that Draphix violated the SMA through the following conduct:

- Receiving and filling orders from customers bearing the RE-PRINT mark;

- Using the RE-PRINT mark on W-9 IRS tax forms which were given to customers;

- Identifying itself using the RE-PRINT mark on customer's credit card statements;

- Failing to take steps to correct customers who referred to Draphix as "Re-Print;"

- Failing to cease and cure this conduct after receiving

notice from Classroom.

Draphix does not dispute that it engaged in these activities. Rather, as discussed below, it argues that these activities are permitted under the terms of the SMA, as read in conjunction with the APA.

On March 9, 2006, after learning of Draphix's above-described conduct, Classroom sent a letter to Draphix charging that the SMA had been violated.  The letter also informed Draphix that, unless certain steps were taken, the SMA would be terminated.   In its letter, Classroom demanded that Draphix contact those customers who received communications containing the RE-PRINT mark to make them aware that Classroom, rather than Draphix, was the actual owner of the Mark.  Instead of taking steps to cure the alleged breach or contacting Classroom to agree upon a workable course of action, Draphix filed an amended counterclaim in the state court action seeking judicial clarification of its right to continue to use the RE-PRINT mark.   Draphix took no steps to address the concerns identified by Classroom before the expiration of the 20 day period to cure.

After Draphix failed to cure its alleged breach of the SMA, Classroom filed the present suit alleging that after the agreement was properly terminated, Draphix continued to use the RE-PRINT mark in violation of both the SMA and federal trademark law.  Draphix filed a counterclaim arguing that in initiating suit Classroom had

-6-

committed abuse of process.  In an earlier order and memorandum opinion (Doc. #29), this court dismissed the counterclaim.  Draphix has appealed that decision.  Shortly after this court dismissed the counterclaim, Classroom filed the present motion for partial summary judgment.

## II. Summary Judgment Standard

In considering a Rule 56 motion, the court must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  The court can enter summary judgment only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted).

## III. Legal Analysis

*a) Preclusion:*

Classroom argues that its earlier victory in the state court action has affirmative preclusive effect in this action and therefore entitles it to a grant of summary judgment in its favor. In response, Draphix argues that far from assuring Classroom's success on this motion, the state court action actually precludes

Classroom from bringing this action in the first place because Classroom's present claims could have been brought in the state court action.  Although the issues are well briefed, it is the conclusion of this court that both sides miss the mark.

I) Offensive Collateral Estoppel

"Under the doctrine of issue preclusion, or collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party (or privy) to the prior litigation."  18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §132.01[1] (3d ed. 2006).  Courts have identified a number of important judicial interests served by the application of the doctrine of issue preclusion.  Perhaps most importantly, issue preclusion operates as a "means of relieving parties of the cost and vexation of multiple lawsuits, preventing inconsistent decisions, encouraging reliance on adjudication and conserving judicial resources."  *McMillian v. Johnson*, 878 F. Supp. 1473, 1519 (M.D. Ala. 1995).  In other words, issue preclusion operates to protect courts from having to adjudicate repetitive disputes between the same parties.

Under Alabama law, issue preclusion is applicable where the "identical issue in question was actually litigated and necessary to the judgment of an earlier suit."  *Manning v. City of Auburn*, 953 F.2d 1355, 1358 (11th Cir. 1992) (citation omitted).  *See also*

*Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 874, 104 S. Ct. 2794 (1984) ("A judgment in favor of either side is conclusive in a subsequent action between them on any issue actually litigated and determined, if its determination was essential to that judgment."). Therefore, it is this court's task to determine whether, in the state court action, a binding and non-gratuitous judgment determined that Draphix improperly used the RE-PRINT mark in connection with the school supply business.

It is undisputed that the state court rendered a judgment in favor of Classroom on the unfair competition claim. Classroom argues that, in arriving at that judgment, the state court not only determined that Draphix competed unfairly, but that a necessary element of the judgment was a determination that Draphix breached the SMA. In support of this position, Classroom points to three particular elements of the state court case: (1) the state court's resolution of Draphix's summary judgment motions; (2) the jury instructions delivered by the state court before the jury returned a verdict in favor of Classroom on the unfair competition claims; and (3) the permanent injunction the state court entered prohibiting Draphix from using the RE-PRINT mark in the educational context. After reviewing Classroom's arguments, this court concludes that there is no basis for finding that the state court, in entering its judgment in favor of Classroom on the unfair competition claim, **necessarily** determined that Draphix breached the

SMA.

A. Draphix's Summary Judgment Motion:

In the state court action, Draphix filed a series of counterclaims against Classroom, alleging, among other things, that in terminating the SMA, Classroom itself violated the agreement through a bad faith anticipatory breach.  These counterclaims were brought shortly after Classroom informed Draphix in its March 9, 2006 letter that it was terminating the SMA.  Draphix's claims were based on the argument that the APA agreement gave Draphix an unqualified right to use the RE-PRINT mark when conjoined with the Draphix mark (i.e. "Re-Print Draphix").  On October 16, 2006, the state court granted summary judgment in favor of Classroom on all of Draphix's counterclaims.  In other words, the state court determined that no disputes of material fact existed as to the liability of Classroom to Draphix for the wrongful termination of the SMA.  However, this finding is not the equivalent of a final judgment of liability by Draphix in favor of Classroom for Draphix's conduct under the APA, and it is on **that** unsettled issue that Classroom seeks to invoke preclusion.  Therefore, the resolution of Draphix's counterclaims on summary judgment is an insufficient basis to support issue preclusion.

The state court apparently shared this court's opinion. Classroom is correct to note that "a judgment is a solemn record," *Fayweather v. Rich*, 195 U.S. 276, 307, 25 S. Ct. 58, 67 (1904), and

should not be disregarded because of extraneous statements made even by the court entering judgment. *See Eaton v. Weaver Mfg. Co.*, 582 F.2d 1250, 1255 (10th Cir. 1978).  Nevertheless, this court notes that the  following remarks of the state court indicate that, like this court, it did not view its grant of summary judgment as a final adjudication of liability:

[Counsel for Classrooom]: We asked for summary judgment and you granted summary judgment in our favor.

The [State] Court: On what?

[Classroom]: On their counterclaims construing . . .

The Court: But I didn't preclude them from using that as a defense.

[Counsel for Draphix]: Absolutely, Judge.  It goes directly with their damage claims.

The Court: They were asking for judgment as a matter of law.

[Draphix] Yes, sir.

The Court: And I refused to do that.  No, I'm not precluding them from using the defense in the case.  That was my intent in the whole thing is that their summary judgment motions seem to be – or claims seems to be in the nature of defenses more than anything.

* * *

[Classroom]: The basis on this language they sues us over this saying that we had breached the contract.

The Court: That's right.  And I granted your summary judgment motion on their claim.

[Classroom]: And the basis for our motion was that they had breached – they were the ones in breach.  And my understanding is that the Court found the in breach, that was the only – that was the . . .

> The Court: **I didn't find them in breach**, I just over – I granted your motion as to their claims, and said they couldn't proceed forward with any counterclaims against you.
>
> [Classroom]: And we asked in our motion for the Court to find that this language did not give them all rights to the Re-Print name that they're claiming and that motion we understood to be granted.
>
> The Court: Well, I didn't understand that that's what I was doing at the time.

Def.'s Ex. 1, State Court Trial Transcript, 7 (emphasis added).  It is, therefore, this court's conclusion that the state court's grant of summary judgment against Draphix on its counterclaims does not mandate a finding in this court that Draphix breached the SMA.

B. The Jury Verdict and the Jury Instructions:

Classroom's next basis for seeking issue preclusion is that the verdict returned by the jury in the state court action, finding for Classroom on its claims of unfair competition, necessarily encompassed a finding that Draphix breached the terms of the SMA. This argument hinges, in large part, on the instructions given to the jury before their deliberations.   The jury instructions included the following passage:

> Now, as to the unfair competition claim, [Classroom] claims that [Draphix] is liable to them for damages for engaging in unfair competition by **among other things** wrongfully using its trademark Re-Print and its former spokesperson to cause confusion along with its catalogs among consumers in the school supply business area.

Pl.'s Ex. E, pg. 1698 (emphasis added).  As the highlighted language in the above-quoted passage implies, the state court's

jury instructions and the evidence presented in the case offered multiple grounds to support a verdict against Draphix for unfair competition.

Even a cursory examination of the evidence in the state court action suggests that there were multiple bases upon which the jury could find against Draphix.  A short list of the evidence presented includes (1) Draphix's use of Celita Carmichael, a former Classroom spokeswoman, (2) the misleading slogans and graphics used by Draphix on its catalogues, and (3) the similarity of the "Teacher Direct" and "Classroom Direct" business names.  This evidence could have formed a basis for the verdict against Draphix even in the absence of the evidence relating to Draphix's allegedly wrongful use of the RE-PRINT mark.  Combined with this court's obligation to construe the facts in the light most favorable to the non-moving party, it is clear that Classroom has not met the Rule 56 obligation to prove that a determination against Draphix on the SMA issue was "necessary" to the judgment entered by the state court on the unfair competition claims.

C. The State Court's Injunction:

Classroom's final, and most convincing, basis for seeking preclusion is the wording of the injunction that the state court issued following the entry of judgment in favor of Classroom.  In relevant part, the injunction reads: "Re-Print/Draphix is prohibited from using the word RE-PRINT in any connection regarding

-13-

the school supply business including catalogs, websites, purchase orders or any similar use." State Court Order, Pl.'s Ex. F.  It is Classroom's position that the state court would not have enjoined Draphix in this manner had it not found Draphix in breach of the SMA.  In other words, "a finding that [Draphix] wrongfully used the RE-PRINT mark in the school market is obviously necessary before the court could permanently enjoin the defendant from any and all use of the mark 'in any connection regarding the school-supply business.'" Pl.'s Reply Br., 14 (quoting State Court Order, Pl.'s Ex. F).

This is not an entirely implausible reading of the state court's injunction.  It is, however, only one possible interpretation.  For example, an injunction which simply tracks the language of the SMA itself "does not equate to a determination that Draphix violated the APA and [SMA] . . . ." Def.'s Br. in Opp. to Mt. for Sum. Judg., 27.  Instead, as Draphix suggests, the injunction may simply have been an attempt to clarify the types of uses of the RE-PRINT mark that are permitted under the APA and SMA.

Ultimately, this court need not determine which party offers a more compelling interpretation of the state court's injunction.  Rather, it is enough to conclude that a non-trivial degree of uncertainty exists as to the actual basis for the state court's order.  Where such uncertainty is present, as it is here, it would be improper for this court to consider the matter fully adjudicated

for purposes of employing collateral estoppel as a dispositive element.

    ii) Res Judicata

    Draphix's invocation of *res judicata* is, in essence, the mirror image of Classroom's collateral estoppel argument.  Under this doctrine, also called claim preclusion, Draphix argues that Classroom is barred from bring its claims in this case because it could have brought them in the state court action.  Although plausible——indeed, this court has noted more than once the possible availability of the issue preclusion defense——it is similarly unavailing.

    *Res judicata* "provides repose by preventing the relitigation of claims that have already been fully litigated and decided." *Pleming v. Universal-Rundle Corporation*, 142 F.3d 1354, 1356 (11th Cir. 1998) (citation omitted).  The doctrine "acts as a bar not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact." *Id.* (quoting *Manning*, 953 F.2d at 1358-59).  Under Alabama law, this doctrine applies if the following conditions are met:

> (1) the question or fact must have been litigated and determined by a court of competent jurisdiction; (2) the final judgment must have been rendered on the merits; (3) the parties, or those in privity with them, must be of such a relationship to the parties in the subsequent action as to entitle them to the benefits and/or burdens of the prior litigation; (4) the same cause of action must be involved in both lawsuits.

*West v. City of Mobile*, 689 So. 2d 14, 16 (Ala. 1997).

A number of similarities exist between the present action and the state court action. Even the parties agree on that much. However, to successfully invoke *res judicata*, Draphix must do more than simply to note the obvious similarities. Where, as in this case, the plaintiff, Classroom, can show that its subsequent claims (1) arise from actions occurring after the initiation of the first suit, (2) are, in part, based on allegations of continuing, wrongful conduct following an early judgment, and (3) are legally distinct from the claims brought in the earlier action, such claims will not be barred.

Classroom initiated the state court action in August 2005. During the course of discovery in that action, Classroom became aware of the facts which lie at the heart of this lawsuit. It was not until March 2006 that Classroom informed Draphix that it was terminating the SMA. It was only upon Draphix's failure to cure the alleged breaches that Classroom acquired its breach of contract claims. Its claim of trademark infringement accrued the moment the license agreement allegedly terminated and Draphix continued to use the RE-PRINT mark. Classroom correctly argues that *res judicata* does not apply to claims acquired well after the initiation of the first suit. Simply repeating the Eleventh Circuit's holding in *Manning*, this court "does not believe that the *res judicata* preclusion of claims that could have been brought in earlier

litigation includes claims which arise after the original pleading is filed in the earlier litigation." *Manning*, 953 F.2d at 1360. This rule avoids the "potentially unworkable requirement that every claim arising prior to the entry of a final judgment must be brought into the pending litigation or lost. *Id.* (quoting *NAACP v. Los Angeles Unified School Dist.*, 750 F.2d 731, 739 (9th Cir. 1984)). It also avoids the problem that would be created by last minute additions to the issues and claims being tried.

Draphix's most persuasive, but ultimately unavailing, argument in favor of a preclusive bar appears in its surreply. Draphix argues that the claims in this case should have been brought as compulsory counterclaims to its own counterclaims which were dismissed by the state court on summary judgment. In support of this position, Draphix cites *Stewart v. Brinkley*, 902 So.2d 1 (Ala. 2004), a case which had a procedural posture even more convoluted than the present case. In *Stewart*, two physicians and their wholly owned professional corporations brought a variety of claims against one another. The Alabama Supreme Court held that certain claims, which could have been raised as counterclaims to the original counterclaims, were barred by operation of *res judicata*. Draphix is correct that the *Stewart* case provides some support for its *res judicata* argument. However, the particular *res judicata* issue that this court faces is subtly, but significantly, different from the *res judicata* issue settled by the court in *Stewart*. As this court

-17-

reads *Stewart*, it stands for the proposition that where a first counterclaim is compulsory, *res judicata* acts to bar claims which should have been brought as compulsory counterclaims to that first counterclaim.  In other words, where the plaintiff and defendant bring three sets of claims against one another (the original claim, the first counterclaim, and the second counterclaim), and all of those claims are so inextricably intertwined as to satisfy the requirements for *res judicata*, any claims not brought will be barred.   This  holding  comports  fully  with  this  count's understanding of the purposes of *res judicata*; namely, to avoid unnecessarily duplicative litigation.

The situation in the present case is significantly different from that in the *Stewart* case.  Here, Classroom brought suit against Draphix for unfair competition.  Draphix, in response, brought **permissive** counterclaims against Classroom, which were unrelated to the unfair competition claims.  These counterclaims were finally dismissed on summary judgment in the state court. Now, Classroom brings claims which, according to Draphix, should have been brought by Classroom as **compulsory** counterclaims to the first Draphix permissive counterclaims.  This is too clever by half.  Indeed, as Classroom notes, the comments to Rule 13 of the Alabama  Rules  of  Civil  Procedure  (which  governed  compulsory counterclaims)  states,  "the  purpose  of  [Rule  13]  is  to  avoid circuity of actions, and to require assertion as counterclaims of

those claims which are likely to turn on the same facts **as the original claim**.   A counterclaim is compulsory if there is any logical relation of any sort between the **original claim** and the counterclaim."   Committee Note to Ala. R. Civ. P. 13 (emphasis added).   It is the conclusion of this court that where, as here, the first set of counterclaims were permissive, claims in a second suit, unrelated to original claims in the first suit, are not barred by *res judicata*, particularly where the permissive counterclaims did not survive summary judgment.

Classroom also argues that *res judicata* is not applicable in actions where the claims brought are based on the continuing, wrongful conduct of a defendant following an earlier judgment.   For this proposition, Classroom cites *Lawlor v. National Screen Service Corp.*, in which the Supreme Court discussed the continuing nature of federal antitrust violations.   349 U.S. 322, 75 S. Ct. 865 (1955).   In *Lawlor*, the Court stated that simply because two suits "involved essentially the same course of wrongful conduct is not decisive.   Such a course of conduct——for example, an abatable nuisance——may frequently give rise to more than a single cause of action."   *Id*. at 327-28.   Such is the situation in this case.   If there is merit to Classroom's allegations in the present action, Draphix, with each use of the RE-PRINT mark, infringes on Classroom's right to its trademark.   *See R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 248 (2d Cir. 2002)

(recognizing the continuing nature of trademark related torts). Therefore, it would be inappropriate to bar Classroom's claims based on Draphix's invocation of any *res judicata* arising out of the state court action.

Draphix objects to the characterization of Classroom's claims as "new" or "continuing." According to Draphix, unlike the claims in *Lawlor*, "the alleged wrongs in this case are not new, but are the same facts and circumstances that were at issue in the [state court action]." Def.'s Surreply, 5. This argument is ineffectual for two reasons. First, as the court has already concluded, the unauthorized use of the RE-PRINT mark is a continuing wrong. Even if *res judicata* applies, it would bar only such of Draphix's claims that accrued before the state court entered its judgment. Second, were the court to adopt the Draphix view, it would, as Classroom notes, have the indirect effect of immunizing Draphix for any future use of the RE-PRINT mark. In other words, by failing to respond to Draphix's initial, unrelated counterclaims in the state court action, Classroom would forever be estopped from asserting its rights to the RE-PRINT mark, rights recognized by Draphix itself in the both the SMA and APA. Such cannot be brought within the purpose of the doctrine of *res judicata*.

Finally, it is worth mentioning that the claims presented in this action are legally distinct from those Classroom brought in the state court action. As has been discussed, Classroom's claim

in the state court action was for unfair competition under 15
U.S.C. §1125(a).  That claim centered on the business practices
Draphix employed as a competitor to Classroom in the school supply
business.  This case, on the other hand, involves a federal
trademark infringement claim brought under 15 U.S.C. §1114(1) and
a claim for breach of contract.  Given the substantial differences
between these claims and Draphix's inability to satisfy the
standard necessary to compel an application of *res judicata*, the
court concludes that Classroom's claims in this action are not
precluded.

     *b) The Breach of Contract Claim:*

     Unable to apply the principles of *res judicata* or collateral
estoppel to the facts at hand, this court is tasked with addressing
the underlying contractual questions raised by Classroom's summary
judgment motion.  The resolution of this issue proves to be no less
complicated than the resolution of the preclusion issue.
Nevertheless, the court concludes (1) that Classroom was within its
contractual rights to demand corrective action from Draphix
regarding its use of the RE-PRINT mark, and (2) that with Draphix's
failure to address the issues raised by Classroom, the SMA
terminated on March 29, 2006.  Therefore, Classroom is entitled,
under the SMA, to the injunctive relief that it seeks.

     *I) Termination of the SMA*

     The SMA grants to Draphix a limited and terminable right to

use the RE-PRINT mark in connection with the sale of architectural and engineering supplies.  Classroom retained the right to use the RE-PRINT mark in the school supplies market, but the agreement prohibited Draphix from using the Mark in this context even in the sale of technical supplies.  The agreement states: "[Draphix] shall not use [the RE-PRINT mark] in connection with any sales, even of engineering, architectural and drafting supplies, into the pre-K thorough 12 educational or school field.  SMA, Pl.'s Ex. A, ¶1(e).

Classroom carefully reserved the exclusive right to determine whether Draphix's use of the RE-PRINT mark weakened or impaired its own rights in the mark.  *Id*. at ¶1(g).  If, in its sole determination, Classroom found that Draphix's conduct "weaken[ed] or impair[ed] [Classroom's] rights in the Mark," Draphix was obligated to immediately "terminate or modify" the offending use of the Mark.  *Id*.  The termination provision of the agreement specifies that upon a material breach of the SMA, the agreement will terminate 20 days from the receipt of notice of such a breach, if no steps have been taken to effect a cure.  *Id*. at ¶10.

ii) Did Draphix's Conduct Constitute a Material Breach?:

Classroom argues that Draphix, in using the RE-PRINT mark in relation to its sales in the school supply market violated the terms of the SMA.  On March 9, 2006, Classroom's counsel sent to Draphix's counsel a letter stating that because of Draphix's use of the RE-PRINT mark, Classroom was invoking the termination

provisions set forth in section 10 of the SMA.   Letter from Nicholas Kees, Def.'s Ex. 11.   Draphix responded with a letter of its own and by adding two counterclaims to the state court action for wrongful anticipatory breach of the SMA and for a declaratory judgment.   Draphix took no steps within the 20 days to modify the conduct identified by Classroom.   Therefore, Classroom argues, the agreement was terminated pursuant to its terms, and summary judgment is appropriate.

In defense of its conduct, Draphix takes the position that (1) its use of the RE-PRINT mark was authorized under the APA (when read in conjunction with the SMA), (2) the facts as alleged by Classroom do not support a finding that the SMA was breached, and (3) any allegedly improper use of the RE-PRINT mark is justified under the doctrine of fair use.

Of these arguments, the least compelling is the invocation of the fair use doctrine.   Draphix is correct that "[a] fair-use defense is established if a defendant proves that its use is (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith."   *Int'l Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (internal quotation and citation omitted).   This is indeed the standard for claiming a particular form of the fair use defense.   However, in claiming that its use of the RE-PRINT mark is "descriptive," Draphix is mistaken.   In the context of the fair use defense, a "descriptive sense" does not

equate to simply identifying the user of the mark in question. Rather, a descriptive phrase is that "term or phrase [which] may describe a characteristic of the goods themselves, such as their size or function or even scent, the qualifications of a service provider, or even an action the company hopes a consumer will take using the product." 3 Jerome Gilson et al., Trademark Protection and Practice §11.08 [3][d][i][A] (2006). Under this definition, the fair use defense is inapplicable in the situation at hand. To illustrate, were Draphix engaged in the business of making photocopies, it might be entitled to a fair use defense for its use of the name "Re-Print." In this case, however, Draphix was using the RE-PRINT mark more akin to its own mark. Because the court concludes that the fair use doctrine provides no defense for Draphix, it need not address the remaining prongs of the fair use analysis.

Draphix next asserts that Classroom is not entitled to summary judgment because, under the terms of the APA and SMA, it is entitled to the unrestricted use of the name "Re-Print Draphix." At the heart of this argument is the purported distinction between the "RE-PRINT" mark and the "Re-Print Draphix" name. While Draphix does not dispute that its use of the "RE-PRINT" mark is governed by the SMA, it argues that the full right to the name "Re-Print Draphix" was transferred to it by the APA. Although the court is ultimately unpersuaded by this argument, Draphix is correct that

something of an ambiguity or anomaly exists in the APA.

In this particular case, the resolution of the discerned ambiguity presents a question of law, not of fact, and thus is to be resolved by the court and not the jury. *Extermitech, Inc. v. Glasscock*, 951 So.2d 689, 694 (Ala. 2006). Neither party offers any extrinsic or parole evidence in an attempt to resolve the ambiguity. Both parties rely entirely on the language of the contract itself, each taking the position that its interpretation is the only proper interpretation. This, in effect, constitutes a concession by both parties that the meaning of the contract is a question for the court and not for a jury. The court agrees.

Where a possible ambiguity is perceived, the court, if possible, "must use established rules of contract construction to resolve the ambiguity." *Voyager Life Ins. Co. v. Whitson*, 703 So.2d 944, 948 (Ala. 1997). Under Alabama law, the intent of the parties is to be ascertained by examining the contract as a whole. *Extermitech*, 951 So.2d at 694. For example, "if there exists any ambiguity between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed." *Homes of Legend, Inc. v. McCullough*, 776 So.2d 741, 746 (Ala. 2000).

The purported ambiguity here requiring resolution is found in the APA. As discussed above, the APA governed Classroom's sale to

Draphix of certain assets related to its architectural and technical supplies business. In section 1, the APA specifically identifies and defines those assets being sold. Under the terms of the agreement, those assets not described in this section "shall not be considered an Asset to be transferred under [the APA]." APA, Def.'s Ex. 5, ¶1. Nowhere in this section is the "Re-Print Draphix" name listed as an asset being transferred. More tellingly, section 2 describes those assets that are explicitly excluded from the sale. Among the assets excluded from sale was "the ownership of the trademar[k] 'Re-Print . . .'" *Id.* at ¶2(c). In contrast, the "Draphix" mark is listed as one of the assets being sold under the agreement. *Id.* at ¶1(f).

This relatively simple enumeration of the assets to be sold and those to be retained by Classroom is complicated by section 15 of the APA, which, as Draphix notes, arguably muddies the waters. That provision states:

> (a) <u>Cessation</u>: Immediately following the Closing, [Classroom] shall cease to use the name "Draphix" or any variations thereof. Seller hereby covenants never to use the name "Re-Print Draphix," whether alone or together with additional words or symbols, in any business venture in the future, **such name and all rights thereto having been transferred to [Draphix] hereunder.** * * *

> (b) <u>License</u>: [Classroom] shall grant to [Draphix], by means of a separate license agreement . . . , a an [sic] exclusive license to use the trademark "Re-Print" . . . .

APA, Def.'s Ex. 5, ¶15(a)-(b). According to Draphix, the proper reading of this passage is as a transfer of the "Re-Print Draphix"

-26-

name to Draphix, free and clear of all restrictions contained in the license agreement.  In response, Classroom argues that section 15, while perhaps confusing, does no such thing and, more importantly, because the above-quoted passage is inconsistent with other parts of the APA and SMA, must be ignored.

Two elements of the APA mandate the interpretation insisted upon by Classroom.  First, the APA explicitly states that the agreement encompassed only those assets which were specifically identified.  Because the "Re-Print Draphix" name was not listed as an asset being transferred it makes no sense to think that a later section would do just that.  Second, the "RE-PRINT" mark is specifically listed as an asset that is **not** being transferred by the agreement.  These two elements of the contract, read in conjunction with the section of the SPA prohibiting Draphix from using an identifier bearing any "similar[ity]" to the RE-PRINT mark, prove to the court that that Classroom's interpretation of the contract as a whole is correct.  *See* SMA, Pl.'s Ex. A, ¶1(e). There is no point in waiting for a Rule 50 motion when a Rule 56 motion presents the same issue a Rule 50 motion would present.

The application of traditional canons of contract construction also weighs so heavily in Classroom's favor that jury resolution is not called for.  To the extent that elements of a contract are irreconcilable, "any doubt[s] [must] be resolved in favor of the first part, considering the instrument as a whole."  *Sullivan,*

*Long & Hagerty v. Southern Elec. Generating Co.*, 667 So.2d 722, 725 (Ala. 1995). The "Re-Print Draphix" name was not transferred under section 1 of the APA. To the extent section 1 conflicts with section 15, the court must give effect to section 1, as appearing earlier in the contract. This is an overpowering rule of construction in this case.

Giving effect to section 1 over section 15 also comports with the court's understanding of the contract as a whole. In section 2 of the APA, the parties agree that Classroom retains **all rights** to the RE-PRINT mark. APA, Def.'s Ex. 5, ¶2. As it argued in a state court filing, "[Classroom] cannot simultaneously retain 'all rights' in RE-PRINT and convey all rights to 'Re-Print Draphix' as the latter includes RE-PRINT." Pl.'s Ex. M, 19. In the absence of evidence to the contrary, it could not have been the parties' intent to so divorce the RE-PRINT mark from the name "Re-Print Draphix" as to find both to be separate assets under the APA.

This holding is also supported by the court's reading of the SMA. The SMA licensed to Draphix the use of the RE-PRINT mark for use in the architectural and technical supplies business. Under the terms of that agreement, Draphix is permitted to use the RE-PRINT mark "as part of [Draphix]'s company name." SMA, Pl.'s Ex. A, ¶1(a). In other words, the SMA permits Draphix to use as its company name "Re-Print Draphix," even where Classroom retains the rights to the RE-PRINT mark. Were the court to accept Draphix's

argument that the "Re-Print Draphix" name had **already** been transferred under the APA, it would effectively nullify the SMA.

Having concluded that section 15 of the APA does not transfer all rights to the name "Re-Print Draphix," the court is left to wonder what actually is meant by this seemingly contradictory provision.  In a brief filed by Classroom in the state court action, it made an attempt to give a plausible reading to section 15.  "A plain reading of the subject phrase – 'such name and all rights thereto **having been transferred** to [Draphix] **hereunder'** – reveals that Section 15(a) does not itself transfer any rights, but merely refers to rights which **have been transferred** in another section of the APA."  Pl.'s Ex. M, 17 (emphasis in original). Classroom is only partially correct.  In all likelihood, assuming that it represents more than simply a mistake in drafting (both parties and good lawyers were fully involved in the drafting, eliminating any *contra proferentem* possibility), section 15(a) indeed refers to a transfer elsewhere in the contract.  However, rather than referring to the APA, as Classroom suggests, the court thinks it much more likely that, in using the word "hereunder," section 15(a) directed the reader's attention to section 15(b), the section of the APA discussing the SMA.  Under this reading, section 15(a) represents nothing more than Classroom's agreement to cease using the name "Re-Print Draphix" because the SMA specifically permits Draphix to use the RE-PRINT mark as part of its company

name.   In the end, whatever the correct interpretation of the contract, the court's resolution of the ambiguity using available rules of construction is that Draphix has no contractual right to use the "Re-Print Draphix" name apart from the provisions of the SMA.   Therefore, the terms of the APA provide no defense for Draphix against Classroom's claims.

Draphix's finally argued basis for a denial of Classroom's motion is that, whatever legal rights it may or may not have to the name "Re-Print Draphix," its conduct in this case did not constitute a material breach of the SMA such that Classroom was justified in terminating the agreement.   In general, "[t]he determination of whether a material breach has occurred . . . is a question of fact" to be submitted to the jury.   23 Williston on Contracts §63:3 (4th ed. 2007).

In this case, the terms of the SMA complicate the analysis on this point.   Draphix is right to note that under the SMA's termination provision, "all rights of [Draphix] under this [a]greement shall terminate if [Draphix] commits a **material** default or breach of any of the terms of this [a]greement or the APA . . . ."   SMA, Pl.'s Ex. A, ¶10(a) (emphasis added).   Were this the only termination provision in the SMA, Draphix's claim that its conduct did not constitute a material breach could conceivably be a question of fact for a jury.

Having already addressed at length the confusion that section

-30-

15 of the APA has caused, the court does not want to criticize unduly the drafters of the other agreement.  It is not surprising that Draphix's materiality of breach argument must be qualified with reference to an earlier section of the SMA.  Section 1(g) of the SMA states:

> Subject to the rights granted under this Agreement, [Draphix] shall not use the [RE-PRINT] Mark in any manner that conflicts with the rights of any third party.  If, in [Classroom]'s **sole determination,** the use of the Mark by [Draphix] infringes or may infringe the rights of any third party **or weakens or impairs or may weaken or impair [Classroom]'s rights in the Mark,** [Draphix] agrees to immediately terminate or modify such use in accordance with [Classroom]'s instructions, and [Draphix] shall have no rights of damages, offset or termination of this Agreement as a result thereof.

SMA, Pl.'s Ex. A, ¶1(g).

The clear and unequivocal terms of the SMA give Classroom broad discretion to determine when Draphix's use of the mark impairs the ownership interest Classroom retained under the APA. Reading the two potentially conflicting provisions in concert, the court concludes that when Classroom invokes its rights under section 1(g), and Draphix fails to address Classroom's concerns, a material breach of the SMA has occurred as a matter of law.  This is true even where the conduct complained of by Classroom might not normally pass the materiality threshold.  It was certainly within the "sole determination" discretion of Classroom to consider the conduct complained of in this case to be such that would or might "weaken or impair" Classroom's rights in the Mark.  Therefore, the letter of March 9, 2006 properly placed Draphix on notice that

Classroom intended to invoke its right to terminate the agreement should the conduct not be cured.  If Classroom had an ulterior or ugly motive in deciding to terminate, that door was opened by the contract language.  This court cannot second guess Classroom's decision.

   c) *Trademark Misappropriation:*

   Classroom also seeks summary judgment on its trademark infringement claim.  This claim is directly related to the breach of contract claim in that until the SMA terminated, Draphix's use of the RE-PRINT mark was contractually authorized.  According to Classroom, when the SMA expired, Draphix's subsequent use of the RE-PRINT mark constituted infringement.  As courts have often recognized, "if a licensee uses a trademark after the expiration of the license agreement, such use will generally be considered infringing."  3 JEROME GILSON ET AL., TRADEMARK PROTECTION AND PRACTICE §11.02[2][d] (2006).  *See, e.g., Klipsch v. WWR Tech. Inc.*, 127 F.3d 729, 738 (8th Cir. 1997) (holding that the termination of the license agreement ended defendant's rights to use plaintiff's trademark and that such continued use amounted to infringement).  The court's earlier conclusions that (1) the SMA was properly terminated, and (2) that the fair use defense is inapplicable in this case compel the entry of judgment in favor of Classroom on the infringement claim.

   d) *Classroom's Requested Relief:*

The final issue under Rule 56 treatment is the appropriate relief to which Classroom is entitled.  Classroom argues that it is entitled to a permanent injunction barring Draphix from using the RE-PRINT mark in any manner whatsoever because (1) such an injunction is contemplated by the terms of the SMA, and (2) an injunction is the proper relief under the Lanham Act.  In its brief, Draphix addresses neither of Classroom's bases for seeking an injunction.  The SMA requires that Draphix terminate all use of the RE-PRINT mark upon termination of the agreement.  SMA, Pl.'s Ex. A, ¶11.  Draphix, which continues to use the RE-PRINT mark in its architectural and technical supplies business, has failed to comply with this provision; conduct consistent with its position that the SMA was not breached, was not terminated effectively, and remains in effect.  As discussed above, the court agrees with Classroom that it successfully terminated the SMA, an event which clearly required Draphix to cease its use of the Mark.  Thus, as Classroom argues, each use by Draphix of the RE-PRINT mark is itself a new breach of the termination provision of the SMA.  As Classroom is quick to point out, this scenario is expressly contemplated by the SMA.  Under section 12(k),

> [e]ach party acknowledges that the other may suffer irreparable damage which cannot be compensated by a money judgment in the event of a breach of the terms of this Agreement by such other party.  Accordingly, in the event of any actual, threatened, or impending violation by a party of the provisions of this Agreement, the other party shall be entitled to temporary and/pr permanent injunctive relief . . . to restrain such breach.

SMA, Pl.'s Ex. A, ¶12(k).

The terms of the contract alone are enough to require the award of injunctive relief.  Even so, Classroom's request for injunctive relief is buttressed by the Lanham Act itself which permits such relief where the unauthorized use of a trademark is likely to cause confusion.  *See* 15 U.S.C. §1116(a).  In general, likelihood of confusion exists where a plaintiff can show that "the public believes that the mark's owner sponsored or otherwise approved the use of the trademark." *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir. 1983) (quotation and citation omitted).

In the present case, the only remaining question under the Lanham Act is whether Draphix's use of the RE-PRINT mark following the termination of the SMA is likely to cause confusion.  This is a slightly more difficult question than the situation where the purported infringer simply misappropriates a trademark.  In other words, there is far less potential for confusion when the infringer uses the mark in a manner that was once, but is not now, sanctioned by the mark holder.  The end result, however, is the same.  As the Eleventh Circuit has explained, "many courts have held that continued trademark use by one whose trademark license has been cancelled satisfied the likelihood of confusion test and constitutes trademark infringement." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983) (collecting citations).  *See also U.S. Structures Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185,

1190 (6th Cir. 1997) (holding that "proof of continued, unauthorized use of an original trademark by one whose license to use the mark has been terminated is sufficient to establish likelihood of confusion.").

It is clear, both from the terms of the SMA and under the "likelihood of confusion" standard embraced by the Lanham Act, that Classroom is entitled to injunctive relief.  This conclusion comports with a common sense understanding of the purpose of injunctive relief.  If this court's finding that the SMA was properly terminated is to be given any real meaning, Draphix must be prohibited from continuing to use the RE-PRINT mark.

In its amended complaint, Classroom asks this court to make an award of attorneys fees in its favor.  The court is not prepared at this time to rule on the attorneys fees issue.  This matter will be addressed after the resolution of all remaining claims.

### IV. Conclusion

In accordance with this opinion, the court will, by separate order, enter summary judgment in favor of Classroom on its claims for breach of contract and trademark infringement and will enjoin Draphix from using the RE-PRINT mark.

DONE this 22nd day of June, 2007.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE